**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------x
:
NORISHA RAMOS SOTO *on behalf of* A.A.R.,   :
:
                     Plaintiff,   :    18-CV-8433 (AJN) (OTW)
:
          -against-       :    **REPORT & RECOMMENDATION**
:
COMMISSIONER OF SOCIAL SECURITY,   :
:
                  Defendant.   :
:
--------------------------------------------------------x

      **ONA T. WANG, United States Magistrate Judge:**

      **To the Honorable Alison J. Nathan, United States District Judge:**

## I.    Introduction

      *Pro se* Plaintiff Norisha Ramos Soto ("Soto") commenced this action on behalf of her minor child, A.A.R. ("Claimant"), against the Commissioner of Social Security ("Commissioner"), seeking review of an administrative law judge's ("ALJ") decision, dated May 3, 2017, finding A.A.R. ineligible for Supplemental Social Security Income ("SSI") benefits pursuant to 42 U.S.C. § 405(g). On July 16, 2018, the Appeals Council denied review of the ALJ's decision. Before the Court is the Commissioner's motion for judgment on the pleadings, made pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. To date, Plaintiff has not served or filed any opposition to the motion, nor has she requested an extension of time in which to serve opposition papers. Despite Plaintiff's failure to respond, I shall consider the merits of the Commissioner's arguments and do not recommend granting the motion on default.

For the reasons set forth below, I respectfully recommend that Defendant's motion be **GRANTED**.

II.    **Facts[1]**

A.    **Procedural Background**

Plaintiff filed an application for SSI on October 6, 2014. (ECF 16 at 152). Claimant was born on February 4, 2007. (*Id*.) Plaintiff alleged Claimant had ADHD, was disabled, and that his disability began on his date of birth, February 4, 2007.[2] (*Id*. at 152, 187) Plaintiff's claim was initially denied on January 6, 2015. (*Id.* at 90). Plaintiff requested a hearing before the ALJ on February 5, 2015. (*Id*. at 96). On February 14, 2017, Plaintiff, Claimant, and counsel for Claimant appeared before ALJ Sommattie Ramrup. (*Id*. at 44). On May 3, 2017, the ALJ issued an unfavorable decision. (*Id*. at 16). The ALJ's decision became final when the Appeals Council denied Plaintiff's request for review on July 16, 2018. (*Id*. at 5, 9). Plaintiff filed a complaint with this Court seeking review of the ALJ's decision on September 14, 2018. (ECF 1).

---

[1] The following facts are taken from the administrative record ("AR") of the Social Security Administration. The AR was submitted in three parts at ECF 16, ECF 16-1, and ECF 16-2.

[2] It is indicated elsewhere that Claimant's disability began on April 10, 2012. (*See* ECF 16 at 187). For the purposes of this motion, October 6, 2014 will be considered the alleged onset date because the earliest month SSI benefits may be paid is the month following the month in which the application for benefits was filed. Claimant was seven years old on the application date.

**B.      Facts**

**1.      Medical Treatment**

**a.      Physical Health Treatment**

**i.      Gouverneur Diagnostic & Treatment Center**

Treatment notes from various doctor's visits were submitted on behalf of Claimant. (ECF 16-1 at 179-219).

On February 16, 2016, Claimant was seen by Dr. Hooshang Behroozi for an earache, fever, swollen cervical nodes, and a "pin [sic]" in his throat. (*Id*. at 217). Dr. Behroozi noted Claimant was overweight and discussed exercise and obesity prevention during the visit. (*Id*. at 216-17).

On May 4, 2016, Claimant was seen by Dr. Kelly Ly because Claimant was experiencing pain his right knee. (*Id*. at 208, 212). Claimant was examined and told to return if his symptoms worsened. (*Id*. at 211).

On May 17, 2016, Claimant was been by Dr. Behroozi for a preventative care visit. (*Id*. at 203). Dr. Behroozi noted that Claimant had a known case of ADHD, but was receiving care and doing better. (*Id*.) Claimant was overweight and needed glasses. (*Id*. at 206). There were no abnormal findings. (*Id*.) Claimant was seen by Dr. Karena Wong on August 9, 2016 for an eye exam. (*Id*. at 202).

Claimant was seen by Dr. Mary McCord on September 8, 2016 for a preventative care exam. (*Id*. at 196). Dr. McCord noted that Claimant had asthma when he was younger but had not missed school or been hospitalized. (*Id*.) No abnormal findings were discovered during the

exam. (*Id*. at 200). The doctor noted Claimant's ADHD diagnosis and medication to treat it. (*Id*.).

Claimant was seen by a nurse practitioner, Manuela Menendez, on October 3, 2016 for a runny

nose, prior earache, and respiratory symptoms. (*Id*. at 192). He was diagnosed with an acute

respiratory infection and told to return if there was no improvement. (*Id*. at 195). Claimant

returned and was seen by Dr. McCord on November 10, 2016. (*Id*. at 186). He was given

albuterol to use as needed for a cough. (*Id*.) Claimant was seen by Dr. McCord again on

February 9, 2017 for a preventative care visit and given a prescription to treat "allergic rhinitis."

(*Id*. at 179).

### b.  Mental Health Treatment

#### i.  Bilingual Psychological Evaluation – Dr. Maria Da Cunha

Dr. Da Cunha completed a bilingual psychological evaluation on January 17, 2012. (*Id*. at

89). The evaluation included a Stanford Binet Intelligence Scales test, Fifth Edition, a Vineland

Adaptive Behavior Scales Test, clinical observations of Claimant, and an interview with Plaintiff,

Claimant's mother. (*Id*.) The examiner noted Claimant was well dressed and well groomed and

made good eye contact. (*Id*.) Claimant was defiant, did not look at demonstrations, and moved

incessantly in his chair. (*Id*. at 90). When he did settle down and watch the demonstrations, he

was able to pick up the task quickly and stay on task. (*Id*.) The examiner noted that "[b]ecause

of [Claimant's] constant clowning around and restlessness, it [was] not clear if he [was]

performing to the best of his ability." (*Id*.) Overall, the examiner stated it was not certain

whether the test results were a fair estimate of Claimant's current level of intellectual

functioning. (*Id.*)

The results of the Stanford Binet Scales test were that Claimant was in the high average range for nonverbal IQ, the average range for verbal IQ, and the average range for full scale IQ. (*Id.*) He did significantly better in the nonverbal domain than the verbal domain. (*Id.* at 95). He scored in the average range in fluid reasoning, procedural knowledge, quantitative reasoning, and visual spatial processing, and the high average range for working memory. (*Id*. at 90).

The results of the Vineland Adaptive Behavior Scales survey were that Claimant was "adequate" in the domains of communication, daily living skills, and motor skills, and "low" in the domain of socialization. (*Id*. at 93). He obtained an "Adaptive Behavior Composite of 86, which gives him a Adequate Adaptive Level and an Age Equivalent to 4.3."[3] (*Id*. at 95). He exhibited some difficult behaviors which "seem[ed] to indicate that [Claimant] can become tense." (*Id*.)

Dr. Da Cunha wrote that Claimant was a "restless and overactive young boy" but that by following her recommendation "it certainly appears that [Claimant] has the potential and motivation to succeed in school." (*Id*. at 96).

### ii.     Occupational Therapy Evaluation – Lauren Greenberg, MS, OTR/L

On January 18, 2012, an occupational therapy evaluation was completed by Ms. Greenberg, a registered/licensed occupational therapist. (*Id*. at 97). The evaluation tools used

---

[3] "The child's chronological age [was] 4.11." (ECF 16-1 at 92).

were an infant toddler sensory profile, a Peabody Developmental Motor Scales test, Second Edition, clinical observations, and a parent and teacher interview. (*Id*.)

Concerning Claimant's social and emotional status during the examination, he demonstrated a good ability to follow simple commands but would become overly excitable. (*Id*. at 98). He repeatedly asked questions during tasks and would lose his attention which would require multiple prompts to get back on task. (*Id*.) He changed positions constantly and would ask to "play something else" repeatedly after participating in an activity for only a few seconds. (*Id*.) His neuromuscular (physical) status and reflexes were normal. (*Id*.)

The examiner used the Peabody Developmental Motor Scales, Second Edition test to assess Claimant's fine motor and visual motor skills. (*Id*.) Claimant "demonstrated an immature pincer grasp . . . to pick up small objects[,]" but could complete other various tasks. (*Id*.) His overall results on the test were "2 standard deviations below the mean and therefore present[ed] a significant delay in age-expected performance." (*Id*. at 99).

The results of the sensory profile indicated a "performance at risk" in the areas of tactile sensitivity, under-responsive/seeks sensation, and auditory filtering. (*Id*. at 100). The examiner stated that Claimant's "difficulty in these three categories . . . has greatly impacted his ability to participate and learn from classroom activities. (*Id*.) Regarding Claimant's self-help skills, the report found that Claimant was independent in toileting and feeding, and was able to dress himself. (*Id*.)

Based on the evaluation, the examiner concluded that "Occupational Therapy intervention is recommended at the CPSE [Committee on Preschool Education] level at this

time in order to address fine-motor delays along with Sensory Processing concerns which may be impacting his ability to perform self-care, social and play activities." (*Id*. at 101).

### iii.    Child Psychiatric Evaluation – Dr. Erica King-Toler

A child psychiatric evaluation was completed by Dr. King-Toler on December 19, 2014. (ECF 16 at 262). She reported Claimant was currently in the second grade and performing at the second-grade level. (*Id*.) He was in special education which involved placement in an integrated co-teaching ("ICT") classroom and received "auxiliary services, including speech, counseling, occupational therapy, and physical therapy." (*Id*.) Dr. King-Toler noted that he had been receiving weekly individual and group therapy at his school for the three years prior to the evaluation and had no history of psychiatric hospitalizations. (*Id*.)

The Claimant reported he had difficulty falling asleep and would wake up frequently. (*Id*.) Beginning at five years old, he would lose his temper frequently, get easily annoyed, argue with adults, refuse to comply with requests, deliberately annoy others, and exhibit a pattern of lying. (*Id*.) At seven years old he began to experience difficulty sustaining his attention, failed to follow through with instructions or finish homework, was easily disorganized and distracted, would frequently fidget and squirm, and was impulsive. (*Id*.) His mother denied any depressive or anxiety related symptoms, Claimant did not express any suicidal or homicidal ideation, and thought disorder symptoms were denied. (*Id*. at 263).

Concerning Claimant's medical and developmental history, there were issues with his birth, but Plaintiff denied any problems or delays in his development and no hospitalizations were reported. (*Id*.) He had asthma and chronic ear infections. (*Id*.)

During the mental health evaluation, Claimant was cooperative and his manner of relating was age appropriate. (*Id*.) His appearance was appropriate, speech was good, and expressive and receptive language were both age appropriate. (*Id*. at 263-64). Dr. King-Toler did not report any issues with his thought processes, affect, mood, sensorium, orientation, insight, or judgment. (*Id*. at 264). His attention and concentration were mildly impaired due to distractibility, he was able to count from one to ten, and he could not count by twos when asked. (*Id*.) He responded "four" when asked two plus three, but responded "ten" when asked seven plus three. (*Id*.) Regarding his recent and remote memory skills, "claimant was able to recall 3 of 3 objects immediately and 1 of 3 objects after five minutes. The claimant was able to recall 5 digits forward and 0 digits backward." (*Id*.) His intellectual functioning was below average and general fund of information was limited. (*Id*.)

Claimant reported he was able to dress himself, bathe himself, brush his teeth, groom himself, use a spoon and had no toileting difficulties. (*Id*.) He reported he was responsible for basic chores such as cleaning his room and taking out the garbage, but Plaintiff reported he was defiant at times when asked to complete his chores. (*Id*. at 264-65). He was able to make friends easily and had a good family relationship. (*Id*. at 265). Dr. King-Toler found that Claimant had moderate limitations when it came to attending to and following age appropriate directions, completing age appropriate tasks, adequately maintaining appropriate social behavior, responding appropriately to changes, learning in accordance with cognitive functioning, asking and requesting information in an age appropriate manner, being aware of

danger and taking needed precautions, and interacting adequately with adults. (*Id*.) A mild

limitation was found in his ability to interact adequately with peers. (*Id*.)

Dr. King-Toler administered a standardized achievement measure called the Wide Range

Achievement Test. (*Id*. at 268). Claimant scored an 86 in reading/decoding at a grade equivalent

of 1.4. (*Id*.) A standardized intelligence measure, the Wechsler Intelligence Scale for Children,

was administered. (*Id*. at 269). Dr. King-Toler reported that:

> Overall, the claimant scored in the low average range of intellectual functioning. The claimant has numerous strengths, however, has several areas which need additional support in the academic setting. On individual indices, the claimant performed in the intellectually disabled range on perceptual reasoning, low average on processing speed, and average on verbal comprehension and working memory indices.
>
> On [s]ubtests that assess verbal and perceptual reasoning, the claimant's subtest scores were mixed, falling within the low average and average range, with one exception. The claimant performed in the high average range in a subtest that assessed short-term auditory memory, concentration (Digit Span).
>
> On performance subtests that assess spatial analysis, abstract reasoning without a motor component (Matrix Reasoning) and visual problem solving (Block Design), the claimant performed in the borderline range. However, the claimant scored in the intellectually disabled range on tasks requiring perceptual reasoning without a motor component (Picture Concepts).
>
> On subtests measuring freedom from distractibility (Coding) and perceptual vigilance (Symbol Search), the claimant scored in the low average and average ranges respectively.

(*Id*. at 269-71).

Dr. King-Toler stated that "[t]he results of the examination appear consistent with

psychiatric and cognitive problems that may interfere with the claimant's ability to function on

a daily basis" and arrived at a diagnosis of ADHD. (*Id*. at 265) Her prognosis was "[f]air given

claimant's current level of cognitive functioning." (*Id*.)

**Psychological Evaluation Report – Roberto Clemente Center**

A psychological evaluation report was completed for Claimant on May 27, 2015. (ECF 16-1 at 58). Claimant was evaluated by a psychology intern, Jennifer Morales-Cruz, who was supervised by Dr. Sonia Meluk. (*Id*. at 73). Claimant was evaluated on seven separate days from March 11, 2015 to May 4, 2015. (*Id*. at 58). Assessment procedures for the evaluation involved the Wechsler Intelligence Scale for Children, Fourth Edition ("WISC-IV"), the Test of Variables of Attention ("TOVA")[4], a semi-structural clinical interview with Claimant's mother, an individualized education program from September 4, 2014, and clinical observations. (*Id*. at 59).

Claimant arrived at each evaluation with his mother, was oriented to time, person, place, and object, and was dressed appropriately and well groomed. (*Id*. at 62). There was no evidence of delusions, paranoia, or suicidal/homicidal ideation and he was friendly, cooperative and approachable. (*Id*.) The evaluator "observed that he displayed fair language impairment receptively" and was occasionally "uncooperative, defensive, and in a hostile manner." (*Id*. at 63). He exhibited hyperactivity and severe distraction and was reluctant to complete assessments. (*Id*.) He consistently did not wait for full instructions and directions often had to be repeated. (*Id*.) The evaluator noted that "unusual circumstances or disruptions during [his] testing might have interfered with [Claimant] giving his best performance." (*Id*. at 64).

---

[4] "The TOVA assessment is a test design[ed] to objectively measure attention, impulsivity and adaptability in children." (ECF 16-1 at 67).

Claimant's intellectual abilities were evaluated using fifteen subtests of the WISC-IV. His cognitive ability was within the average range and it could be "stated with 95% confidence that his Full Scale IQ[ ] falls somewhere between 90-109." (*Id*.) His general intellectual skills were between low average and high average ranges. (*Id*.) The evaluator summarized his subtest scores by stating his reasoning abilities were in the extremely low range and his nonverbal reasoning was in the extremely low range. (*Id*. at 65-67). The TOVA test suggested ADHD and the results were not within the normal limits. (*Id*. at 67).

The evaluator concluded that "[b]ased on administered tests and other assessments used, [Claimant] demonstrates an average cognitive level of functioning." (*Id*. at 68). She also found that "[o]verall results suggested that [Claimant] has the potential to obtain much better results of his cognitive level of functioning." (*Id*.) She recommended family counseling and for Claimant to continue with therapy and IEPs at school. (*Id*. at 69). In order to facilitate his acquisition of appropriate social behaviors, she recommended he receive "short, concise, clear instructions, and set limits[,]" as well as positive reinforcement. (*Id*.)

### v.     Psychological Evaluation – AHRC Family and Clinical Services

On September 23, 2015, a psychological evaluation was completed by NYS Certified School Psychologist Lauren Lynch and supervising psychologist Jan Roth-Hauptman. (*Id*. at 105, 109). Claimant arrived at the evaluation adequately groomed and appropriately dressed. (*Id*. at 106). Claimant was 8 years old, had been receiving special education services throughout his education, and was repeating the second grade in an ICT class. (*Id*. at 109). He was also

receiving occupational therapy, speech therapy, and both group and individual counseling. (*Id*.) The examiner noted he had received psychotherapy and medication management at the Roberto Clemente Family Clinic. (*Id*.) The tests administered were the Stanford Binet Intelligence Scales, Fifth Edition, and the Vineland Adaptive Behavior Scales – Second Edition ("Vineland-II"). (*Id*. at 106).

The results of the Stanford Binet Intelligence Scales were that Claimant was classified in the low average range for nonverbal IQ, the mildly impaired range in verbal IQ, and the borderline impaired range for full scale IQ. (*Id.*) His full scale IQ score placed him in the 4th percentile, his verbal IQ score was in the 1st percentile, and his nonverbal IQ score was in the 13th percentile. (*Id*.) Claimant's scores were lower than what was reported on the 2012 evaluation. (*Id*.)

The Vineland-II, which summarizes the overall level of Claimant's adaptive functioning resulted in a standard score of 81, which is in the moderately low range of adaptive functioning. (*Id*. at 108). The examiner found this to be consistent with the level of functioning reported on the 2012 evaluation. (*Id*.)

The examiner concluded that Claimant's "overall intellectual functioning as well as his current level of adaptive functioning do not meet the criteria of Intellectual Disability[,]" and he "should continue to receive all current programs and services, including psychotherapy." (*Id*. at 109).

### vi.    Treatment Summary – Gouverneur Health

A summary of Claimant's treatment was submitted by therapist Carmen Lugo-Dominguez and Dr. Rodriguez-Loyola, who is a clinical psychologist. (ECF 16 at 214-216). The summary was not dated, but the date it was received by the SSA was January 11, 2017. (*Id*. at 213). Claimant's diagnosis was for ADHD and he was prescribed 36mg of methylphenidate ER daily. (*Id*. at 214).

Claimant had been treated for ADHD at the Roberto Clemente Center since February 2015. (*Id*.) His treatment at the time of the report involved "psychotherapy and collateral family sessions under the care of Carmen Lugo-Dominguez, Psy. D. and medication management under the care of Miguel A. Vilaro-Colon, M.D." (*Id*. at 215). His symptoms included "difficulty sustaining attention on a consistent basis; susceptibility to distraction by extraneous stimuli; repeated failure to complete school assignments or chores on [sic] a timely manner; impulsivity as evidenced by difficulty awaiting turn and frequent intrusions into other's business; and poor tolerance to frustration." (*Id*. at 214). Claimant was cooperative, respectful and friendly towards his therapist. (*Id*. at 215). His treatment recommendations stated he should continue participating in weekly therapy and that he would benefit from a structured environment at home and school and reasonable accommodations fitted to his emotional and behavioral needs. (*Id*. at 216).

Treatment records for Claimant's visits were also submitted. They noted Claimant's problem with ADHD and the consistent "goal" written on the reports was to "maintain adequate level of attention/impulse control progress." (*See* ECF 16-2 at 2-45). Notes pertaining

to each visit were brief and generally provided updates on his progress, such as being promoted to third grade, or recent issues. The general trend of the reports are consistent with the summary provided and indicated Claimant's issues were still present, but were continuously improving. (*See id*.).

### vii.    Letter – Dr. Miguel Vilaro-Colon

Plaintiff submitted a letter from Dr. Vilaro-Colon and therapist Leyinska Clas-Wiscovitch, dated February 15, 2017. (ECF 16-1 at 225). The letter states that Claimant had been receiving treatment for ADHD at the Roberto Clemente Clinic since February 18, 2015. (*Id*.) His symptoms were listed as: "difficulty sustaining attention on a consistent basis, susceptibility to distraction by extraneous stimuli, repeated failure to complete school assignments or chores on [sic] a timely manner, impulsivity as evidenced by difficulty awaiting turn and frequent intrusions into other's business, and poor tolerance to frustration." (*Id*.) The letter also stated that Claimant is taking medication and "[t]reatment is expected to abate the symptoms that would allow him to develop his intellectual potential." (*Id*.) Lastly, they stated "[w]e believe [Claimant] will benefit from the SSI, which will help him continue to receive the services needed to succeed in school." (*Id*.)

### 2.    State Agency and Consultative Examiner Reports

### a.    Dr. S. Gandhi, Pediatrics

In January 2015, the state agency report found Claimant to be "not disabled." (ECF 16 at 85). The report stated that Claimant had ADHD, a medically determinable impairment, but while "severe" it did not meet, medically equal, or functionally equal the listings. (*Id*. at 83).

Functional equivalence was determined by evaluating Claimant's functioning in the required six domains on the childhood disability evaluation: acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulation of objects, caring for yourself, and health and physical well-being. (*Id*. at 83-84).

A rating of "less than marked" was given for "acquiring and using information." (*Id*. at 83). This was based on Claimant being enrolled in the second grade and performing at the second grade level, his mother reporting he was receiving therapy from multiple sources, no information regarding language function, testing indicating low-average cognitive function, average verbal skills, decoding issues, but higher listening skills, an ability to answer higher level questions after reading aloud, and age appropriate receptive and expressive language skills. (*Id*.) The report also noted Claimant's oral reading and oral language skills had improved. (*Id*.)

A rating of "less than marked" was given for "attending and completing tasks." (*Id*.) This was based on findings that Claimant exhibited restless motor behavior, and mild impairments to attention and concentration due to distractibility. (*Id*.) The report noted Claimant was not prescribed medication. (*Id*.)

A rating of "less than marked" was given for "interacting and relating with others." (*Id*.) This was based on reports that Claimant was occasionally argumentative and defiant at home and that he needed to have better compliance with classroom rules, but was able to participate in class discussions and responded well to positive reinforcement. (*Id*. at 84). The report also cited to reports that Claimant benefited from counseling services, had a clear voice and

appropriate expressive language and eye contact, was able to make friends easily, and had a good family relationship. (*Id*.)

A rating of "less than marked" was given for "moving about and manipulating objects." (*Id*.) The report stated Claimant had a frequent need for movement and had difficulty transitioning between classes, but was receiving therapy and his gross motor function was within average range. (*Id*.) The report also observed that Claimant had "immature pincer grasp and difficulty closing buttons[,]" and that therapy improved his handwriting skills. (*Id*.)

A rating of "less than marked" was given for "caring for yourself." (*Id*.) The examiner cited to reports that Claimant needed to self-regulate his own behavior, and that he paid attention to negative behaviors performed by peers but was less aware of his own behaviors. (*Id*.) When prompted to think about his negative behaviors, however, he was able to reflect and engage in a dialogue about himself. (*Id*.) He was also "able to perform all self care activities independently." (*Id*.)

A rating of "less than marked" was given for "health and physical well-being." (*Id*.) Plaintiff had reported Claimant had asthma, but the symptoms were managed with an inhaler as needed. (*Id*.) There was no history of ER or hospital visits. (*Id*.) Claimant was prescribed eyeglasses, but did not like to wear them. (*Id*.)

Overall, the examiner found that the "[o]bjective findings do not support the severity of claimant's allegations." (*Id*. at 85).

**C.**     **Non-Medical Evidence**

    **1.**     **Function Reports**

On October 6, 2014, Plaintiff completed a Social Security Administration ("SSA") function report/questionnaire. (*Id*. at 167). She indicated that Claimant had problems seeing long distance and used glasses, but had no problems hearing. (*Id*. at 168). Claimant was not totally unable to talk, but had problems speaking clearly and being understood by people who did not know him well. (*Id*. at 169). Plaintiff checked the box indicating she was not sure whether Claimant's ability to communicate was limited, but checked the box for "yes" when asked whether he did or had the capacity to: deliver phone messages, repeat stories he had heard, tell riddles or jokes, explain why he did something, use sentences with "because," "what if," or "should have been," talk with family, and talk with friends. (*Id*. at 170).

Plaintiff checked that Claimant's ability to progress in learning was limited. (*Id*. at 171). On the questionnaire, Plaintiff checked "no" for his ability to: read capital letters and small letters, write in longhand, and write a simple story with 6-7 sentences. (*Id*.) She also indicated he did not know the days of the week and the months of the year. (*Id*.) She indicated he could: read capital letters of the alphabet, read simple words, read and understand simple sentences, read and understand stories in books or magazines, print some letters, print his name, spell most 3-4 letter words, add and subtract numbers over 10, understand money and make correct change, and tell time. (*Id*.) She checked the box for "no" when asked whether Claimant's physical abilities were limited. (*Id*. at 172).

Plaintiff reported that Claimant's impairment affected his behavior with other people because he "sometimes gets too excited and does not know how to control his emotions." (*Id*. at 173). Related to the question, Plaintiff checked "yes" for whether Claimant "has friends," "[c]an make new friends," "[g]enerally gets along with [Plaintiff] or other adults," "[g]enerally gets along with school teachers," and "[p]lays team sports." (*Id*.)

Plaintiff checked the box that she was "not sure" whether Claimant's impairments affected his ability to help himself and cooperate with others in taking care of personal needs. (*Id*. at 174). She checked that he was able to: use zippers, button clothes, tie shoelaces, take a bath or shower, brush his teeth, comb his hair, wash his hair, hang up clothes, help around the house, get to school on time, and eat using a knife, fork, and spoon. (*Id*.) Plaintiff checked "no" when asked whether Claimant could choose clothes by himself, pick up and put away his toys, do what he is told most of the time, obey safety rules such as looking for cars before crossing the street, and accept criticism or correction. (*Id*.)

Lastly, Plaintiff indicated Claimant had a limited ability to pay attention and stick with a task. (*Id*. at 175). Claimant could not keep busy on his own or finish things he started, but could "work[ ] on arts and crafts projects," "[c]omplete[ ] his homework," and "complete[ ] chores most of the time." (*Id*.)

On February 5, 2015, Plaintiff submitted an additional function report associated with her appeal. (*Id*. at 194). She reported that there were no new illnesses, injuries, or conditions regarding Claimant, but there had been a change in his condition since the last disability report filed in September 2014. (*Id*.) Plaintiff described the change as "[p]oor performance in school,

18

behavioral issues with teachers[,]" and the approximate date the changes occurred was January 2015. (*Id*.) Plaintiff also answered "yes" in response to a question asking whether Claimant had any new physical or mental limitations and described the new limitations as "difficult to concentrate, frustrated easily, hypersensitivity to noise." (*Id*.) The new limitations arose in January 2015. (*Id*.)

Plaintiff noted that Claimant had seen a doctor/hospital/clinic for the illnesses, injuries, or conditions and for emotional or mental problems since the previous disability report. (*Id*. at 195). In November 2014, Claimant was taken to the emergency room for an ear infection. (*Id*.) He had also continued receiving regular check-ups and immunizations from his pediatrician, and continued to see his school psychologist. (*Id*. at 196). She answered "no" to whether any medications were being taken, whether any additional medical tests had been conducted or were scheduled, and whether there were any changed in daily activities since the previous disability report. (*Id*. at 197).

## 2. Educational Records

An Individualized Education Program ("IEP") dated April 10, 2012, noted Claimant's results on a Stanford-Binet Intelligence Scales test. (ECF 16 at 229). He had a nonverbal IQ in the high average range, a verbal IQ in the average range, and a full scale IQ in the average range. (*Id*.) It was reported that his performance on the test was "below average" and he "demonstrated weaknesses in the communication and social and emotional domain and weaknesses with the cognitive domain." (*Id*.) His strengths were in the physical development and adaptive behavior domains. (*Id*.)

The IEP noted that in the Vineland Behavior Scales Survey, "his relative weakness appears in the domain of Socialization [and] [h]is relative strengths . . . appear in the domains of Communication, Daily Living Skills and Motor Skills." (*Id*. at 230). He had issues with clear speech and correct enunciation and did not define five simple words. (*Id*.) The report stated he was a very active child and "distractible with a short attention span and does not focus on tasks." (*Id*.)

On an IEP dated May 22, 2014, his teacher estimated his academic skills to be at a first grade or kindergarten level. (*Id*. at 243). His first-grade teacher observed that he was "an energetic, athletic, friendly boy, who loves to dance [and] [t]hough he seems to test low in [r]eading due to decoding issues, his listening comprehension is higher." (*Id*.) Another teacher wrote that he had made academic and social-emotional progress during the school year. (*Id*.) It was also noted that informal reading assessments yielded inconsistent results and that his "oral reading and oral languages skills are areas that are improving and continue to need improvement." (*Id*. at 243-44). Claimant was able to "answer higher level questions after a read aloud" and "give thoughtful responses to questions about why he thinks the author wrote the text." (*Id*. at 243). He was also able to quote evidence to support his opinions. (*Id*.) Regarding Claimant's ADHD diagnosis, the IEP found he was responding well to counseling support. (*Id*. at 244). He would have difficulty transitioning from class to class and required redirection but was responding well to positive reinforcement. (*Id*.)

The IEP noted he needed to increase his ability to self-regulate and was sometimes hyper vigilant in his awareness of other students' behaviors but much less aware of his own

when they are committed. (*Id*.) He was, however, able to reflect and engage in discussions about his actions. (*Id*.) It was also reported that Claimant had "experienced academic and social-emotional progress as a result of school-based counseling services" and continued to benefit from them. (*Id*. at 245). The IEP found Claimant "should have full access to the general education curriculum with appropriate modifications." (*Id*. at 247).

Regarding the Claimant's physical development, the May 2014 IEP reported he was currently receiving occupational therapy services, that he had asthma, and that his overall gross motor skills were in the average range. (*Id*. at 245). He had seen an eye doctor and had been prescribed eyeglasses, but did not like to wear them. (*Id*.) In order to manage his needs, the report stated it was sometimes necessary to position him away from his peers because "his body tends to make movements inadvertently." (*Id*.)

Plaintiff submitted a letter, dated June 12, 2014 and addressed to the Department of Education, from Alison Pepper, Claimant's licensed master social worker, expressing that it was her professional opinion that Claimant's needs were not being met in his current modified general education classroom and that, given his ADHD diagnosis, he "would benefit most from an ICT classroom and the support of a special education teacher throughout his school day." (*Id*. at 258). The letter was written at the request of Plaintiff, who had grown frustrated by the lack of options for her son at his school. (*Id*.)

A mid-year evaluation from Claimant's second-grade teacher for the 2014-2015 term showed that Claimant was "approaching grade level" in the categories of working collaboratively, working independently, understanding letter to sound relationships, completing

writing assignments, understanding writing conventions, and ability to solve single and double step word problems. (ECF 16-1 at 4, 27). He was evaluated to be "far below grade level standards" in demonstrating self-confidence, reading and understanding text/stories, generating ideas for writing and putting them on paper, and mastery of basic computations. (*Id*.) Claimant's teacher wrote it was a pleasure having him in school that semester, that he was friendly and outgoing, and that since working with him, she had seen academic and social improvements and was very pleased with his progress during the semester. (*Id*. at 5, 28).

A February 2015 evaluation from Claimant's second grade teacher showed the following grades[5]: "excellent" for "attendance and punctuality," "satisfactory" for "ability to listen," "satisfactory" for "confidence," "excellent" for "homework completion," "satisfactory" for "classroom behavior," "good" for "relationship with peers," and "excellent" for "interest of parents." (*Id*. at 2). She rated all of his skills as "approaching grade level." (*Id*. at 3).

On June 24, 2015, another IEP was completed. (*Id*. at 112). It reported that Claimant was "functioning at an early first grade level" and had "benefited from additional scaffolded support through small group instruction." (*Id*.) He had "made great progress in math and [was] on grade level with computation[.]" (*Id*.) While Claimant had "solid comprehension skills" when it came to reading independently, "his reading level [was] delayed mainly due to decoding differences." (*Id*.) He had also made improvements in his writing, though he had "a tendency to claim he cannot do his work before trying[.]" (*Id*. at 113). Claimant would get "distracted easily and

---

[5] The possible grades were "excellent," "good," "satisfactory", and "unsatisfactory." (ECF 16-1 at 266).

benefits from small group instruction and separate seating away from peers." (*Id*.) He "enjoy[ed] helping his peers which also helps keep him on task." (*Id*.)

Subsequent to an educational evaluation, Claimant was determined to be functioning in the "'Average' range in the areas of letter-word identification, spelling, calculation, and writing samples [but was] functioning in the Low Average range in the area of passage comprehension and applied problems (math word problems)." (*Id*.) He benefitted from the repetition of directions. (*Id*.) Claimant also received a speech evaluation which indicated he presented with "average receptive and expressive language abilities." (*Id*.) The evaluation found that although he "presented with age-appropriate receptive and expressive language abilities . . . weaknesses [ ] may be addressed with speech-language intervention." (*Id*.)

In the area of social development, the IEP reported that Claimant was "aware of school rules and expectations, but tend[ed] to make impulsive decisions that get him into conflicts." (*Id*.) He showed "signs of hyperactivity and an inability to focus on one task at a time" and required constant reminders to stay on task. (*Id*.) He benefitted from sitting away from peers or other distracting stimuli, and receiving positive incentive, rewards, and praise. (*Id*. at 113-14). He was very sociable and had a few good friends. (*Id*. at 114).

In the area of physical development, Claimant was reported in the IEP to be in good health. (*Id*.) He loved dancing, playing basketball, and participating in gym and yoga. (*Id*.) He had difficulties with handwriting and the report noted he was receiving occupational therapy. (*Id*.) During occupational therapy, he was generally compliant and loved the movement activities, but his attention span and concentration was poor to fair. (*Id*.) Through occupational

therapy, his handwriting had improved from poor to fair. (*Id*.) The IEP recommended that Claimant's occupational therapy should be reduced from twice a week to once a week. (*Id*.)

Regarding the effect of Claimant's needs on his involvement in the general education curriculum, it was "believed that [Claimant] can participate and progress within the general education classroom and access the general education curriculum with the support of a full time ICT program." (*Id*.)

On an IEP dated May 20, 2016, Claimant had functional levels of "2nd grade" for reading and math. (*Id*. at 176). He obtained a full scale IQ on the WISC-V of 80, which placed in in the low average range and the 9th percentile. (*Id*. at 167). He had mixed results on math assessments, but appeared to improve over time. (*Id*.) His average spelling test score was 99%. (*Id*.) His scores on various writing assignments indicated he was "approaching grade level standards." (*Id*.)

In the IEP section labelled academic achievement, functional performance and learning characteristics, Claimant presented "with areas of relative cognitive strength, which include[d] his verbal concept formation skills, ability to differentiate between essential and non-essential features, ability to see part to whole relationships and visually manipulate abstract information when provided a structure." (*Id*.) His areas of weakness included "his ability to hold onto and manipulate auditory and visual information, and his ability to process visual information quickly." (*Id*.) Claimant still exhibited problems with attention and staying on task. (*Id*. at 168).

Concerning Claimant's speech and language issues, his improvements led to the recommendation that due to his "current performance, ability to access the curriculum, and his

ability to utilize strategies to complete tasks, it is recommended that [he] be decertified from speech and language services." (*Id*.)

In the area of social development, the report again indicated Claimant had issues with distractions and focus but benefited from focusing prompts, short breaks, and positive reinforcement. (*Id*. at 169). He was very social and got along well with his peers, with strong peer relationships in and out of the classroom. (*Id*.) He liked "to make personal connections with his teachers and [got] along well with any adult he [came] in contact with." (*Id*.) He was reported to be caring and respectful, and could follow directions, but needed to independently complete work and focus on current tasks. (*Id*.)

In the area of physical development, it was noted that Claimant was diagnosed with ADHD, for which he took medication. (*Id*.) He was generally in good health and had been undergoing occupational therapy for two years to improve his graphomotor skills and attention span and concentration. (*Id*.) These areas had improved to the point where the IEP recommended that he be discharged from occupational therapy services. (*Id*.) Claimant was also reported to be a good dancer and an athlete. (*Id*.)

Claimant's management needs were listed to be: "[p]ositive reinforcement/verbal praise," "[r]epetition of instructions/directions," "[r]efocusing prompts and redirection," "[e]ncouragement to ask a peer and/or teacher when he is unable to remember steps," "[c]hecklist for procedures to help him hold onto information," "[f]ading support getting started on tasks," and "[b]reak tasks into manageable steps." (*Id*. at 170). The IEP stated Claimant's "needs can be met in the general education setting with ICT and related services." (*Id*.) The IEP

also noted that Claimant's parent "expressed concern about terminating all related services, but ultimately understands that it's because he's met his goals." (*Id*. at 177).

Claimant's report card dated January 18, 2017 showed a report of satisfactory. (ECF 16 at 224). He met the standard for reading and received a "satisfactory" for academic and personal behaviors. His teacher wrote that he "respect[ed] school rules, and is a regular participant during lessons[, but] [h]e needs to continue to work on persevering through challenging tasks by trying different strategies, especially math." (*Id*.) He received the following teacher comments and numerical grades on a 100-point scale: 65 for writing, noting he needed to stay motivated to complete all tasks; 55 for mathematics, noting he needed to check his work to ensure he precisely and accurately solved problems, but that he could use skip counting and draw equal groups to solve multiplication problems; 87 for science, noting he consistently participates; 65 for social studies and history, noting he had to continue working on using more vocabulary in his writing; 90 for physical education and health, noting he displayed a high level of effort and demonstrated age appropriate levels of movement, control, and fitness; and 85 for visual art, noting that he showed improvement but needs continued encouragement. (*Id*.)

### 3. Claimant's Testimony

At the hearing on February 14, 2017, Claimant testified that math is his best subject in school and "none" are his worst. (*Id*. at 50). He played basketball and had no problems doing so. (*Id*.) He got along with his friends and cousins and read, did math, watched TV, and played video games in his free time. (*Id*. at 51).

### 4. Plaintiff's Testimony

Plaintiff testified that Claimant had "deep" issues, a learning disability, and that the issues were discovered when he was in kindergarten. (*Id*. at 53). He would be easily distracted and had problems focusing. (*Id*.) Plaintiff reported she often had to repeat herself to Claimant when it came to getting ready for school in the morning, and that he did not act his age. (*Id*.) She stated that he had been taking medication for ADHD on Monday through Saturday for school. (*Id*. at 53-54). The medication helped Claimant focus while at school and he has been taking it for a year or two. (*Id*. at 54, 65). The medication made Claimant more calm, focused, and able to follow directions. (*Id*. at 66). Plaintiff testified that when Claimant is on the medication, he is able to stay on track with school. (*Id*.) Regarding additional medication, Claimant controls his asthma with an asthma pump. (*Id*. at 54-55).

Plaintiff stated that Claimant saw a psychiatrist once a month and a therapist once a week. (*Id*. at 55). He also saw a second therapist and received group counseling once a week at school. (*Id*.) Plaintiff stated math was Claimant's best school subject and reading and writing was his worst. (*Id*. at 56). He was also receiving special education services at the school. (*Id*.) Plaintiff stated Claimant does not have problems playing sports but would sometimes experience shortness of breath due to his asthma. (*Id*.) Claimant had never been suspended or had any disciplinary issues, but he would get in trouble occasionally for telling other kids what to do. (ECF 16 57). He had only been sent to the principal once. (*Id*. at 57).

Claimant's teachers told Plaintiff that he had trouble paying attention and completing tasks, and that he would shut down when he felt frustrated and upset. (*Id*.) Claimant would complete his homework but it would often take three to four hours to do so, particularly with

reading and writing. (*Id*.) Sometimes Claimant had issues with teachers when they told him what to do, and Plaintiff reported the same issues at home. (*Id*. at 58).

Plaintiff testified that Claimant was able to feed, dress, and bathe himself, but that she had to pick his clothes for him and he had trouble getting up in the morning. (*Id*. at 59). His chore at home was to clean his room, but he had issues doing so. (*Id*.) Plaintiff stated Claimant goes to the Boys' Club. (*Id*.) He was "okay" when it came to sports there, but did not like other general activities, such as reading programs. (*Id*. at 59-60).

In Claimant's free time, he would go to the homes of other family. (*Id*. at 60). He was generally okay visiting Plaintiff's mother's house, but would not play with the other kids because he was the oldest, instead wanting to spend time on the tablet. (*Id*.) On his father's side of the family, he would often fight with his cousin. (*Id*.) Plaintiff also explained that Claimant would play video games but would get frustrated or upset if he could not do something. (*Id*. at 61). When this happened he would go to his room, slam the door, and "shut down" for two to three hours. (*Id*.) When he got upset in class, his group counselor had taught him strategies to leave the class for five to ten minutes to relax. (*Id*. at 61-62). Plaintiff reported this occurred almost every day. (*Id*. at 62).

At school, Claimant sat next to the teacher in an effort to ensure he would not get easily distracted, and Plaintiff stated his teachers have told her that this was working to keep him on track. (*Id*. at 61). Regarding IEPs, Plaintiff testified that Claimant has had these since he was four years old. (*Id*. at 62). He also repeated the second grade and had participated in a number of special classes such as speech and group/one-on-one counseling. (*Id* at 62-63). Plaintiff believed

Claimant had issues with writing due to his memory. (*Id*. at 63). Claimant also received tutoring twice a week outside of school. (*Id*. at 64).

**III.    Analysis**

**A.    Applicable Legal Principles**

**1.    Standard of Review**

A motion for judgment on the pleadings should be granted if the pleadings make it clear that the moving party is entitled to judgment as a matter of law. However, the Court's review of the Commissioner's decision is limited to an inquiry into whether there is substantial evidence to support the findings of the Commissioner and whether the correct legal standards were applied. Substantial evidence is more than a mere scintilla but requires the existence of "relevant evidence as a reasonable mind might accept as adequate to support a conclusion," even if there exists contrary evidence. *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004); *see also Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990). This is a "very deferential standard of review." *Brault v. Soc. Sec*. *Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012). The Court may not determine *de novo* whether Plaintiff is disabled but must accept the ALJ's findings unless "a reasonable factfinder would *have to conclude otherwise*." *Id*.

**2.    Determination of Childhood Disability**

"An individual under the age of 18 shall be considered disabled for the purposes of this subchapter if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than

12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). To determine whether a child is disabled, an ALJ must conduct a three-step analysis. 20 C.F.R. § 416.924(a). The Second Circuit described the process as follows:

> First, the child must not be engaged in "substantial gainful activity." [20 C.F.R.] § 416.924(a). Second the child "must have a medically determinable impairment(s)" that is "severe" in that it causes "more than minimal functional limitations." *Id*. § 416.924(c). Third, the child's impairment or combination of impairments must medically or functionally equal an impairment listed in an appendix to the regulations. *See id*. § 416.924(d) . . .

> For a child's impairment to functionally equal a listed impairment, the impairment must "result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." 20 C.F.R. § 416.926a(a). The domains that the regulations establish to determine whether impairments result in marked or extreme limitations are: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for oneself, and (6) health and physical well-being. *Id*. § 416.926a(b)(i). The [Social Security Administration] must determine whether an impairment or combination of impairments causes a "marked" limitation on a child's functioning in at least two of these domains, and an "extreme" limitation in at least one domain. A "marked" limitation is "'more than moderate' but 'less than extreme'" and "interferes seriously with" a child's "ability to independently initiate, sustain, or complete activities." *Id*. § 416.926a(e)(2)(i). An "extreme" limitation is "'more than marked'" and "interferes very seriously with" a child's "ability to independently initiate, sustain, or complete activities." *Id*. § 416.926a(e)(3). The regulations recognize that an impairment or combination of impairments may have effects in more than one domain; thus the [Social Security Administration] evaluates a child's impairments in any domain in which they cause limitations. *Id*. 416.926a(c).

*Encarnacion ex rel George v. Astrue*, 568 F.3d 72, 75-76 (2d Cir. 2009).

### B.     The ALJ's Decision

The ALJ applied the three-step analysis described above and determined that Claimant was not disabled. (ECF 16 at 19, 36).

At step one, the ALJ found that Claimant had never engaged in substantial gainful activity. (*Id*. at 22).

At step two, the ALJ found that Claimant's medical impairments – attention deficit hyperactivity disorder ("ADHD"), learning disability, and asthma – rose to the level of "severe" because they caused significant limitations on Claimant's functional abilities. (*Id.*)

At step three, further considering the medical severity of Claimant's impairments, the ALJ decided that he did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 416.924, 416.925, and 416.926). (ECF 16 at 22). The ALJ reasoned that "[t]he medical evidence of record does not document signs, symptoms, or laboratory findings indicating any impairment severe enough to meet the criteria of any listed impairment" and that "[n]o treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment." (*Id.*)

The ALJ considered listing 103.03 pertaining to Claimant's asthma, but found that the condition did not meet or equal the listing due to the lack of evidence of attacks in spite of treatment and "requiring physician intervention, occurring a least once every 2 months or at least six times a year[,]" and because he did not have "persistent low-grade wheezing or a growth impairment." (*Id.*) Listings 112.05 and 112.11 were also considered for Claimant's learning disorder and ADHD, but she found they were not met because was little evidence to show Claimant had "significantly sub-average intellectual functioning or deficits in adaptive functioning" or that his "ADHD manifests itself in inappropriate degrees of inattention, impulsiveness or hyperactivity." (*Id.*)

Continuing with step three, the ALJ next determined that Claimant's alleged impairments did not functionally equal a listed impairment and analyzed his impairments via the six functional domains. (*Id*. at 23). The ALJ considered the:

> objective medical evidence and other relevant evidence from medical sources; information from other sources, such as school teachers, family members, or friends; the claimant's statements (including statements from the claimant's parent(s) or other caregivers); and any other relevant evidence in the case record, including how the claimant functions over time and in all settings (i.e., at home, at school, and in the community.

(*Id*.)

The ALJ gave the state agency pediatric consultant's assessment "great weight" because the opinion was "consistent with the medical evidence of record as a whole and [it was] supported with relevant evidence." (*Id*. at 28). The opinion of Dr. King-Toler was also given "great weight," because she "had the opportunity to conduct a detailed clinical interview with, and perform a comprehensive mental status examination of the claimant" and "[h]er opinion regarding specific functional limitations . . . are consistent with her own findings and the rest of the record, and supported with an explanation." (*Id*.) The opinion, discussed *supra*, found Claimant had moderate limitations in several areas and a mild limitation interacting with peers, and diagnosed Claimant with ADHD and specific learning disorder. (*Id*. at 27). The recommendation to grant disability benefits from Claimant's psychiatrist was given "little weight," because it was "not an opinion, and a recommendation on the ultimate issue of disability [is] reserved to the Commissioner." (*Id*. at 28-29).

The ALJ then turned to the six functional equivalence domains. First, she found Claimant had a "less than marked limitation" in "acquiring and using information." (*Id*. at 30). The ALJ

32

reasoned that Claimant's "second grade teachers reported that his reading and writing skills greatly improved during the fall semester[, his] school performance improved despite lingering behavioral issues, and claimant was promoted to third grade." (*Id*.) She also found that the IQ tests administered by Dr. King-Toler and the school psychologist placed Claimant's intellectual functioning in the low-average range and that this did not meet the criteria of an intellectual disability. (*Id*.) Regarding Claimant's speech and receptive and expressive language skills, the ALJ found that the evidence indicated these had improved to the extent that Claimant's skills were age appropriate. (*Id*.)

Second, she found Claimant had a "less than marked limitation" in "attending and completing tasks." (*Id*. at 31). This was based on testimony from Claimant's mother that his ADHD was under control and he was doing well on his current medications. (*Id*.) This was confirmed by Claimant's treating psychiatrist. (*Id*.) The ALJ also noted that the consultative examiner reported restless motor behavior and a mild impairment due to distractibility, that the Claimant's report card indicated he was a regular participant during lessons, and that school records indicated he responded well to positive reinforcement. (*Id*.)

Third, she found Claimant had a "less than marked limitation" in "interacting and relating with others." (*Id*. at 32). The ALJ cited to testimony by Claimant's mother which said Claimant was able to make friends easily and had a good family relationship. (*Id*.) The ALJ also cited to school records and Claimant's report card which showed that Claimant's "personal behaviors were satisfactory[, ] that [he] respects school rules and is a regular participant in lessons[, and he] is social and gets along well with peers and adults." (*Id*.)

Fourth, the ALJ found Claimant had "no limitation" in "moving about and manipulating objects." (*Id*. at 33). The ALJ noted that Claimant's mother testified he attended the Boy's Club, played basketball, video games, and card games. (*Id*.) She also noted that "[s]chool records indicate[d] that [C]laimant's gross motor function is within normal limits[,]" and his recent report card indicated he displayed "a high level of effort during fitness activities, and demonstrate[d] age appropriate movement, control, and fitness skills." (*Id*.) The evidence also showed that he was accepted to his school's soccer and basketball teams, that he enjoyed fishing with his father, that he is a "great dancer" and athlete, and that he actively participated in gym and played during recess. (*Id*.)

Fifth, she found Claimant had "less than a marked limitation" in the "ability to care for himself." (*Id*. at 35). The ALJ cited to Claimant's mother's testimony, Dr. King-Toler's report, and Claimant's report card, which indicated he was able to feed, bathe, and dress himself, take out the garbage, help with laundry, clean his room, and respect school rules. (*Id*.)

Sixth, she found Claimant had a "less than marked limitation" in "health and physical well-being." (*Id*.) The ALJ noted Claimant suffers from asthma, but that this is well-controlled with an inhaler and there is no history of emergency room visits or hospitalizations. (*Id*.) Beyond that, the records indicated he was in good physical health. (*Id*.)

The ALJ ultimately concluded that Claimant did not have an impairment or combination of impairments that resulted in either "marked" limitations in two domains of functioning or an "extreme" limitation in one domain of functioning, and that Claimant had not been under a

disability within the meaning of the Social Security Act since September 9, 2014, the date the application was filed. (*Id*. at 35-36).

## C. Analysis

On June 6, 2019, the Commissioner filed a motion for judgment on the pleadings. (ECF 20). In his memorandum of law, the Commissioner argued that the final decision by the ALJ in this matter is supported by substantial evidence and should be affirmed and that the motion for judgment on the pleadings should be granted. (ECF 21).

As a preliminary matter, I find that the ALJ's decision was not contrary to the law. She followed the three steps of the sequential analysis required to be performed in determining disability for an SSI-benefits claimant under the age of 18. At each of the three steps, the ALJ described the correct legal standard and applied it in making her determinations. The Court does not see any legal error in her determinations and thus does not find her decision contrary to the law.

### 1. Substantial Evidence Supports the ALJ's Determination That Claimant's Impairments Do Not Meet Or Medically Equal A Listed Impairment.

Applying the three-step analysis, the ALJ correctly determined that Claimant had satisfied steps one and two by finding that he had not engaged in substantial gainful activity and had the following severe impairments: ADHD, learning disability, and asthma. (ECF 16 at 22). Accordingly, the next issue is whether the ALJ's determination at step three that Claimant's severe impairments do not meet or medically equal a listed impairment is supported by substantial evidence in the record. While the ALJ did not

provide an in-depth analysis of this issue, "the absence of an express rationale for an

ALJ's conclusions does not prevent us from upholding them so long as we are 'able to

look to other portions of the ALJ's decision and to clearly credible evidence in finding

that [her] determination was supported by substantial evidence.'" *Salmini v. Comm'r of*

*Soc. Sec.*, 371 F. App'x 109, 112 (2d Cir. 2010) (internal quotations and citations

omitted). For the reasons below, I conclude that the ALJ's determination on this issue is

supported by substantial evidence.

The ALJ found that Claimant did not have an impairment or combination of

impairments that met or medically equaled the severity of one of the listed impairments

in 20 C.F.R. Part 404, Subpart P, Appendix 1. (ECF 16 at 22). She considered the three

listings pertaining to Claimant's impairments: 112.11 as it pertained to Claimant's ADHD,

112.05 as it pertained to Claimant's learning disability, and 103.3 as it pertained to

Claimant's asthma. (*Id*.)

### a.        ADHD and Learning Disability

Listing 112.11 provides the following:

112.11 Neurodevelopmental disorders (see 112.00B9), for children age 3 to attainment of age 18, satisfied by A and B:

A. Medical documentation of the requirements of paragraph 1, 2, or 3:

1. One or both of the following:

a. Frequent distractibility, difficulty sustaining attention, and difficulty organizing tasks; or

b. Hyperactive and impulsive behavior (for example, difficulty remaining seated, talking excessively, difficulty waiting, appearing restless, or behaving as if being "driven by a motor").

2. Significant difficulties learning and using academic skills; or

3. Recurrent motor movement or vocalization.

AND

B. Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning (see 112.00F):

1. Understand, remember, or apply information (see 112.00E1).

2. Interact with others (see 112.00E2).

3. Concentrate, persist, or maintain pace (see 112.00E3).

4. Adapt or manage oneself (see 112.00E4).


20 C.F.R. Part 404, Subpart P, Appendix 1 § 112.11.


Listing 112.05 provides:


112.05 Intellectual Disorder (see 112.00B4), for children age 3 to attainment of age 18, satisfied by A or B:

A. Satisfied by 1 and 2 (see 112.00H):

1. Significantly subaverage general intellectual functioning evident in your cognitive inability to function at a level required to participate in standardized testing of intellectual functioning; and

2. Significant deficits in adaptive functioning currently manifested by your dependence upon others for personal needs (for example, toileting, eating, dressing, or bathing) in excess of age-appropriate dependence.

OR

B. Satisfied by 1 and 2 (see 112.00H):

1. Significantly subaverage general intellectual functioning evidence by a or b:

a. A full scale (or comparable) IQ score of 70 or below on an individually administered standardized test of general intelligence; or

b. A full scale (or comparable) IQ score of 71-75 accompanied by a verbal or performance IQ score (or comparable part score) of 70 or below on an individually administered standardized test of general intelligence; and

2. Significant deficits in adaptive functioning currently manifested by extreme limitation of one, or marked limitation of two, of the following areas of mental functioning:

a. Understand, remember, or apply information (see 112.00E1); or

     b. Interact with others (see 112.00E2); or

     c. Concentrate, persist, or maintain pace (see 112.00E3); or

     d. Adapt or manage oneself (see 112.00E4).

20 C.F.R., Part 404, Subpart P, Appendix 1 § 112.05.

   The ALJ determined there was "little evidence to show that claimant ha[d] significantly sub-average intellectual functioning or deficits in adaptive functioning. Likewise, there is little evidence showing that claimant's ADHD manifest[ed] itself in inappropriate degrees of inattention, impulsiveness or hyperactivity." (ECF 16 at 22).

   Claimant's full scale IQ was assessed and reported in the record numerous times. The scores reported were 81 in December 2014, 93 as reported in May 2015, 73 in September 2015, 80 in May 2016, and "average" in January and April 2012. (ECF 16 at 269; ECF 16-1 at 72; ECF 16-1 at 106; ECF 16-1 at 167; ECF 16-1 at 90; and ECF 16 at 229 (respectively)). Plaintiff's lawyer argued in a letter that Claimant's September 2015 score demonstrated that he had a limitation sufficient to meet the threshold for a "marked limitation." (ECF 16 at 149-50). All but one of these scores, however, are above the minimum listing requirement and the examiner stated that the Claimant did "not meet the criteria of Intellectual Disability" at the end of the psychological evaluation. (ECF 16-1 at 109). The majority of scores placed Claimant above the minimum range and the "role of the ALJ [is] to resolve the differing evidence." *See Vazquez ex rel. Jorge v. Barnhart*, No. 04-cv-7409 (GEL), 2005 WL 2429488, at *6 (S.D.N.Y. Sept. 30, 2005). Thus, this Court declines to conclude that the ALJ's determination was not supported by substantial evidence.

In addition, and as will be analyzed below, the ALJ's analysis of the six functional equivalence domains is sufficient to support her determination that Claimant did not have the requisite deficits in adaptive functioning, as required by listing 112.05 or mental functioning, as required by listing 112.11.

Accordingly, the Court finds there was substantial evidence to support the determination that Claimant's impairments here did not meet or medically equal these listings.

**b.      Asthma**

Listing 103.03 requires medical evidence showing:

> 103.03 Asthma (see 103.00G) with exacerbations or complications requiring three hospitalizations within a 12-month period and at least 30 days apart (the 12-month period must occur within the period we are considering in connection with your application or continuing disability review. Each hospitalization must last at least 48 hours, including hours in a hospital emergency department immediately before the hospitalization.

20 C.F.R. Part 404, Subpart P, Appendix 1 § 103.03.

Here, the ALJ correctly noted there was no evidence that Claimant had been hospitalized or required physician intervention at all. (*See* ECF 16 at 22). Moreover, the record indicated Claimant's asthma was under control with the use of his inhaler. Accordingly, Claimant's asthma did not meet or medically equal the severity of the listed impairment of asthma.

**2.**    **Substantial Evidence Supports the ALJ's Determination That Claimant's Impairments Do Not Functionally Equal A Listed Impairment**

The next issue is whether the ALJ's determination that Claimant's impairments do not functionally equal a listed impairment is supported by substantial evidence. The ALJ analyzed the correct six domains required and considered both the medical and non-medical evidence in the record. Accordingly, I conclude that that the ALJ's decision is supported by substantial evidence.

First, the domain of "acquiring and using information" involves "how well [a child] acquire[s] or learn[s] information, and how well [the child] use[s] the information [he or she] has learned." 20 C.F.R. § 416.926a(g). The regulations state that for school-aged children attending elementary school:

> [Y]ou should be able to learn to read, write, and do math, and discuss history and science. You will need to use these skills in academic situations to demonstrate what you have learned; e.g., by reading about various subjects and producing oral and written projects, solving mathematical problems, taking achievement tests, doing group work, and entering into class discussions. You will also need to use these skills in daily living situations at home and in the community (e.g., reading street signs, telling time, and making change). You should be able to use increasingly complex language (vocabulary and grammar) to share information and ideas with individuals or groups, by asking questions and expressing your own ideas, and by understanding and responding to the opinions of others.

*Id*. § 416.926a(g)(2)(iv).

Here, the ALJ determined that Claimant had a "less than marked" limitation in this domain. (ECF 16 at 30). The AR indicates that Claimant performed at or just below grade-level academically and that he had shown improvement during the course of treatment. It was

reported in 2014 that Claimant could answer higher level questions when they were read aloud, give thoughtful responses to analytical questions, and quote evidence to support his opinions. By 2016, Claimant was performing at grade-level standards.

The psychiatric evaluation completed by Dr. King-Toler found that Claimant's thought processes were coherent and goal-oriented and his expressive and receptive language was age appropriate, even though his intellectual functioning was below average and his general fund of information was limited. She reported that Claimant had a moderate limitation in his ability to learn in accordance with cognitive functioning and his ability to ask and request information in an age appropriate manner.

The state agency medical consultant found a "less than marked" limitation in this domain and noted that Claimant had low average cognitive function, average verbal skills, decoding issues but higher listening skills, an ability to answer higher level questions after reading aloud, and age appropriate receptive and expressive language skills. The record showed he improved to the point that he be decertified from speech and language services. Claimant was also promoted to the third grade. Accordingly, there was substantial evidence in the record to support the ALJ's conclusion in this domain.

Second, the domain of "attending and completing tasks" involves "how well [a child is] able to focus and maintain . . . attention, and how well [a child] begin[s], carr[ies] through, and finish[es] . . . activities, including the pace at which [a child] perform[s] activities and the ease with which [he or she] change[s] them." 20 C.F.R § 416.926a(h). The regulations state that for school-age children:

> [Y]ou should be able to focus your attention in a variety of situations in order to follow directions, remember and organize your school materials, and complete classroom and homework assignments. You should be able to concentrate on details and not make careless mistakes in your work (beyond what would be expected in other children your age who do not have impairments). You should be able to change your activities or routines without distracting yourself or others, and stay on task and in place when appropriate. You should be able to sustain your attention well enough to participate in group sports, read by yourself, and complete family chores. You should also be able to complete a transition task (e.g., be ready for the school bus, change clothes after gym, change classrooms) without extra reminders and accommodation.

*Id*. § 416.926a(h)(2)(iv).

Here, the ALJ determined that Claimant had a "less than marked" limitation in this domain. (ECF 16 at 31). Plaintiff's lawyer argued that Claimant had a "marked" limitation in this area because he remained easily distracted, had to be seated away from stimuli, and because he tended to make impulsive decisions that would lead to conflict. (*Id*. at 149). Plaintiff testified, however, that Claimant's ADHD was under control, he was doing well with his medication, and that he was able to stay on task at school. Plaintiff reported that Claimant was able to complete his homework assignments, and his school records support that assertion. Claimant's psychiatrist reported the same. Claimant's school reports also indicated his concentration and focus had improved and he responded well to positive reinforcement and being placed further away from peers.

Dr. King-Toler found moderate limitations in Claimant's ability to attending to and following age appropriate directions and completing age appropriate tasks. She noted he was responsible for basic chores, but was sometimes defiant in completing them. The state agency consultant found a "less than marked" limitation in this area. This was based on the finding that

Claimant exhibited restless motor behavior and mild impairments to attention and concentration due to distractibility. Accordingly, there was substantial evidence to support the ALJ's conclusion in this domain.

Third, the domain of "interacting and relating with others" involves "how well [a child] initiate[s] and sustain[s] emotional connections with others, develop[s] and use[s] the language of [his or her] community, cooperate[s] with others, compl[ies] with rules, respond[s] to criticism, and respect[s] and take[s] care of the possessions of others." 20 C.F.R. § 416.926a(i). The regulations state that for school-age children:

> [Y]ou should be able to develop more lasting friendships with children who are your age. You should begin to understand how to work in groups to create projects and solve problems. You should have an increasing ability to understand another's point of view and to tolerate differences. You should be well able to talk to people of all ages, to share ideas, tell stories, and to speak in a manner that both familiar and unfamiliar listeners readily understand.

*Id*. § 416.926a(i)(2)(iv).

Here, the ALJ determined that Claimant had a "less than marked" limitation in this domain. (ECF 16 at 32). There were numerous reports in the record stating that Claimant was able to get along with peers and make and maintain friendships. Dr. King-Toler reported only a mild limitation in Claimant's ability to interact adequately with his peers. The state agency consultant found a "less than marked" limitation based on reports that Claimant was occasionally argumentative and defiant at home and needed to have better compliance with rules at home, but he regularly participated in class discussions and responded well to positive reinforcement. He also reported Claimant benefited from counseling services, spoke with a clear voice and

appropriate language and made appropriate eye contact, was able to make friends easily, and had a good family relationship. Accordingly, there was substantial evidence to support the ALJ's conclusion in this domain.

Fourth, the domain of "moving about and manipulating objects" involves "how [a child] move[s] [his or her] body from one place to another and how [a child] move[s] and manipulate[s] things. These are called gross and fine motor skills." 20 C.F.R. § 416.926a(j). The regulations state that for school-aged children:

> [Y]our developing gross motor skills should let you move at an efficient pace about your school, home, and neighborhood. Your increasing strength and coordination should expand your ability to enjoy a variety of physical activities, such as running and jumping, and throwing, kicking, catching and hitting balls in informal play or organized sports. Your developing fine motor skills should enable you to do things like use many kitchen and household tools independently, use scissors, and write.

*Id*. 416.926a(j)(2)(iv).

Here, the ALJ determined that Claimant had "no limitation" in this domain. (ECF 16 at 33). Claimant played basketball, loved to dance, and was generally a good athlete. School records indicated his gross motor function was within the normal range. The state agency consultant found a "less than marked" limitation as Claimant was receiving occupational therapy which improved his handwriting, had a gross motor function within the average range, and had difficulty closing buttons and an immature pincer grasp. Due to Claimant's progress, it was recommended that his occupational therapy services be terminated. Accordingly, there was substantial evidence to support the ALJ's conclusion in this domain.

Fifth, the domain of "caring for yourself" involves "how well [a child] maintain[s] a healthy emotional and physical state, including how well [a child] get[s] [his or her] physical and emotional wants and needs met in appropriate ways; how [a child] cope[s] with stress and changes in [his or her] environment; and whether [a child] take[s] care of [his or her] own health, possessions, and living area." 20 C.F.R. § 416.926a(k). The regulations state that for school-aged children:

> You should be independent in most day-to-day activities (e.g. dressing yourself, bathing yourself), although you may still need to be reminded sometimes to do these routinely. You should begin to recognize that you are competent in doing some activities and that you have difficulty with others. You should be able to identify those circumstances when you feel good about yourself and when you feel bad. You should begin to develop understanding of what is right and wrong, and what is acceptable and unacceptable behavior. You should begin to demonstrate consistent control over your behavior, and you should be able to avoid behaviors that are unsafe or otherwise not good for you. You should begin to imitate more of the behavior of adults you know.

*Id*. § 416.926a(k)(2)(iv).

Here, the ALJ determined that the Claimant had a "less than marked" limitation in this domain. (ECF 16 at 35). Plaintiff testified, and it was reported throughout the AR, that Claimant was able to feed, bathe, and dress himself. He was also responsible for basic chores such as cleaning his room and taking out the garbage. Dr. King-Toler found a moderate limitation in being aware of danger and taking needed precautions. The state agency consultant found a "less than marked" limitation in this domain because he was able to perform self care activities independently. The consultant noted that Claimant needed to regulate his own behavior and paid attention to the negative behaviors of others more than his own. Despite this, Claimant was able

to reflect on his own behavior and engage in a dialogue about himself. Accordingly, there was substantial evidence to support the ALJ's conclusion in this domain.

Sixth, the domain of "health and physical well-being" involves "the cumulative physical effects of physical or mental impairments and their associated treatments or therapies on [a child's] functioning that [were] not consider[ed] [under the domain of 'moving about and manipulating objects']. When [a child's] physical impairment(s), . . . mental impairment(s), or . . . combination of physical and mental impairments has physical effects that cause "extreme" limitation in [a child's] functioning, [the child] will generally have an impairment(s) that 'meets' or 'medically equals' a listing." 20 C.F.R. § 416.926a(l).

Here, the ALJ determined that the Claimant had a "less than marked" limitation in this domain. (ECF 16 at 35). Claimant's medical records showed no indication of any serious health issues and many of the reports found him to be in good health. As noted by the ALJ, the records showed that Claimant's asthma was under control and his lungs were reported to be clear in a number of examinations. The state agency consultant determined Claimant had a "less than marked" limitation as there was no history of ER visits or hospitalizations. He noted Claimant's asthma, but reported the symptoms were under control with the use of his inhaler. Claimant was prescribed glasses, but did not like to use them. Accordingly, there was substantial evidence to support the ALJ's conclusion in this domain.

Given the reasoning above, the Court finds that there was substantial evidence to support the ALJ's determination that Claimant did not have an "extreme" limitation in any single domain of functioning, or two "marked" limitations in any two domains.

**IV.     Conclusion**

For the reasons set forth above, I respectfully recommend that Defendant's motion for judgement on the pleadings be **GRANTED**.

**V.     Objections**

In accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days (including weekends and holidays) from receipt of this Report to file written objections. *See also* Fed. R. Civ. P. 6(d) (allowing three (3) additional days for service by mail). A party may respond to any objections within fourteen (14) days after being served. Such objections, and any responses to objections, shall be addressed to Judge Nathan. Any requests for an extension of time for filing objections must be directed to Judge Nathan.

**FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS <u>WILL</u> RESULT IN A WAIVER OF OBJECTIONS AND <u>WILL</u> PRECLUDE APPELLATE REVIEW.** *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983).

The Clerk of Court is respectfully directed to mail a copy of this Report and Recommendation to the *pro se* Plaintiff.

Respectfully submitted,

*s/ Ona T. Wang*

Dated: February 4, 2020                                    **Ona T. Wang**
     New York, New York                         United States Magistrate Judge